FILED
2011 Mar-18 PM 02:38
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **GWENDELL L. PHILPOT,** | ) | |
| **ANNETTE GREEN PHILPOT,** | ) | |
| **Individually and on behalf of a class of** | ) | |
| **persons similarly situated,** | ) | |
|  | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. _____** |
|  | ) | |
| **MERSCORP, INC.;** | ) | **JURY TRIAL DEMANDED** |
| **JPMORGAN CHASE BANK, NA;** | ) | |
| **GMAC RESIDENTIAL FUNDING** | ) | |
| **CORPORATION; GMAC MORTGAGE,** | ) | |
| **LLC; THE BANK OF NEW YORK** | ) | |
| **MELLON TRUST COMPANY, NATIONAL** | ) | |
| **ASSOCIATION, FKA THE BANK OF** | ) | |
| **NEW YORK TRUST COMPANY, NA;** | ) | |
| **HOMECOMINGS FINANCIAL, LLC** | ) | |
| **FKA HOMECOMINGS FINANCIAL** | ) | |
| **NETWORK, INC.** | ) | |
|  | ) | |
| **Defendants.** | ) | |

## CLASS ACTION COMPLAINT

Comes now the Plaintiffs, Gwendell L. Philpot and Annette Green Philpot, on their own behalf and on behalf of others similarly situated, and sue the Defendants, Merscorp, Inc.; GMAC Residential Funding Corporation; GMAC Mortgage, LLC; J. P. Morgan Chase Bank, N.A.; The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company N.A.; and Homecomings Financial, LLC, fka Homecomings Financial Network, Inc., as follows:

### The Nature of the Action

1. This is an action for declaratory and injunctive relief as well as for treble damages, costs and attorney fees under 18 U.S.C. §§1962 and 1964, otherwise known as the "Racketeer

Influenced and Corrupt Organizations Act" or "RICO." Plaintiffs also bring claims under state law.

2.    This Court has jurisdiction under 28 U.S.C. §1331.

## The Named Parties

3.    Gwendell L. Philpot and Annette Green Philpot are the Plaintiffs. They bring suit on behalf of themselves and as Class Representatives. They have standing to sue in that capacity because they possess the same interest and suffered the same type of injury as all other Class Members.  They are resident citizens of the State of Alabama.

4.    Defendant Merscorp, Inc., is a foreign corporation created in or about 1998 by conspirators from the largest banks in the United States in order to undermine and eventually eviscerate long-standing principles of real property law, such as the requirement that any person or entity who seeks to foreclose upon a parcel of real property: 1) be in possession of the original note and mortgage and 2) possess a written assignment giving he, she or it actual rights to the payments due from the borrower pursuant to the mortgage and note. Defendant Merscorp, Inc., claims to be the sole shareholder in an entity by the name of Mortgage Electronic Registration Systems, Inc., ("MERS"). MERS is the RICO enterprise and is the primary innovation through which the conspirators, including the Defendants, have accomplished their illegal objectives as detailed throughout this Complaint.

5.    Defendant GMAC Residential Funding Corporation is a foreign corporate entity which is a participant in MERS. As a national organization, it conducts substantial business in the State of Alabama, and it is therefore appropriate that it be required to defend this suit in this Court.

6.    Defendant GMAC Mortgage, LLC is a national organization, it conducts substantial

business in the State of Alabama, and it is therefore appropriate that it be required to defend this suit in this Court.

7.    Defendant J. P. Morgan Chase Bank, N.A is a foreign corporate entity which is a participant in MERS. As a national organization, it conducts substantial business in the State of Alabama, and it is therefore appropriate that it be required to defend this suit in this Court.

8.    Defendant The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company N.A. is a foreign corporate entity which is a participant in MERS. As a national organization, it conducts substantial business in the State of Alabama, and it is therefore appropriate that it be required to defend this suit in this Court.

9.    Defendant Homecomings Financial, LLC fka Homecomings Financial Network, Inc., is a foreign corporate entity which is a participant in MERS.  As a national organization, it conducts substantial business in the State of Alabama, and it is therefore appropriate that it be required to defend this suit in this Court.

## Factual Background

10. Plaintiffs, Gwendell Lloyd Philpot and Annette Green Philpot, are residents of Decatur, Alabama.  On December 4, 2000, Gwendell Philpot executed a 30-year, fixed rate, note in the total amount of $220,000.00 payable to Homecomings Financial Network, Inc. (Homecomings), a Delaware corporation, whose principle of place of business is in Minneapolis, Minnesota.

11. Contemporaneous with the execution of the above-referenced note, Plaintiffs Gwendell Lloyd Philpot and Annette Green Philpot executed a mortgage on their personal home, the historic "Judge Seybourn Lynne House" located in the Old Decatur Historic District in Decatur, Alabama.  The mortgage listed the Plaintiffs as Mortgagors and listed the Mortgagee as

"Mortgage Electronic Registration System, Inc., a separate corporation acting solely as a nominee for lender and lender's successors and assigns".  Mortgage Electronic Registration System, Inc. (MERS) is a Delaware corporation.

12.  In 2008, after Plaintiffs' financial situation had been affected by the loss of a job and health issues, the lender gave notice of acceleration of the debt and began foreclosure proceedings.  Plaintiffs sought a loan modification process with the lender and the lender agreed to a delay to determine whether a loan modification workout could be accomplished.  The lender again began foreclosure proceedings in the spring of 2009 after Plaintiffs were unable to achieve any satisfactory commitment to modify their mortgage payments.  The lender has now resumed foreclosure proceedings and is threatening to foreclose on March 23, 2011.

13.  Plaintiffs filed a Chapter 7 Bankruptcy petition in February, 2009, the day before their house was due to be sold on the courthouse steps through foreclosure.  During the pendency of the Plaintiffs' bankruptcy, Homecomings Financial, LLC (the successor corporation to Homecomings Financial Network, Inc.) moved for relief from the automatic stay alleging that they held a mortgage lien on the Plaintiffs' property seeking leave to foreclose or to seek to "negotiate a loss mitigation forbearance or other agreement with the debtor in an attempt to avoid foreclosure or other action".  On May 6, 2009, the Bankruptcy Court granted Homecomings relief from the stay.  On May 21, 2009, Plaintiffs were discharged in bankruptcy.

14.  Thereafter, Plaintiffs attempted to seek a loan modification or remediation with no success.  Homecomings began foreclosure proceedings with public notice of foreclosure in the late summer or early fall of 2009, but subsequently agreed to delay the sale.  In 2010 they again published notice of foreclosure on multiple occasions.  As of this date, foreclosure is pending, with a sale scheduled for March 23, 2011.

15. In the 1990s, the mortgage industry changed significantly in this country. Prior to that time, home loans were made by various banking and similar entities and held by them until maturity. In the 1990s and continuing into the next decade, mortgages were almost exclusively originated by one entity and then sold to others. The loans were bundled together and then sold as mortgage backed securities, a process that became a hugely profitable venture for the Wall Street investment banks and the entities originating the mortgage loans. Since the entity making the loan did not carry the risk, under-writing standards were essentially eliminated or ignored. The mortgage industry introduced new "products" into the American marketplace. These products included "non-documentation loans" and adjustable rate mortgages, known as "ARMS." Mortgage lenders, acting in coordination with one another, relaxed their standards for lending, which made an entirely new class of lower-income individuals eligible to receive loans. This, in turn, drove up property "values." As part of this scheme, banks and other lenders "accepted" appraisals "documenting" the new, higher values, and approved hundreds of thousands of applications for financing which would normally have been declined.

16. Unbeknownst to the borrowers and the public, these loans were being made to support the billions of dollars of mortgage backed securities that banks including those named in this action were creating to sell on Wall Street. The lenders knew that the new loans were "bad paper;" this was of little concern to them because they intended to realize profits so great as to render such interest, even if it had been received, negligible by comparison. Part of the reason this fraudulent scheme has gone largely unnoticed for such an extended period of time is its sophistication.

17. Since the mortgage loans were being transferred repeatedly in the mortgage

backed securities scheme, the industry needed a mechanism to allow that to happen.  To do this, a number of participants in the mortgage industry came together and created defendant MERSCORP, Inc.   The shareholders, including Defendants, and the entity they created function as a RICO association-in-fact enterprise.   Defendants have also participated in implementing the enterprise. The purpose of the enterprise was to create MERS to facilitate the mortgage backed securities scheme and to allow it to function.  The MERS website states that: "Shareholders played a crucial role in the development of MERS."  The website further states that: "Any loan registered on the MERS® System is inoculated against future assignments because MERS remains the nominal mortgagee no matter how many times servicing is traded."  The note upon which the mortgage loan is made is not assigned to MERS.  Instead, the legal and equitable rights are divided in a way that is prohibited, and MERS functions through a fraudulent legal fiction that it has some right to a mortgage loan that it did not make and for which it has no right to recover.

18.   One material change in the mortgage system was the inclusion in new mortgages of intentionally ambiguous provisions pertaining to MERS. As is the case with most of the written documents routinely used in the scheme, such as "assignments", each word concerning MERS in these standardized mortgages is carefully crafted so as to allow those relying upon it to infinitely recede in their positions and to be moving targets virtually unreachable by standard legal means. The standard mortgage is a form entitled "Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT –MERS." The document was written in a way that is difficult for lay-people to understand.

19.  Soon after the mortgage transactions, the lenders promptly sold the loans to "investors" for some percentage or fraction of what had been the alleged value of the mortgage

and the property by which it was secured just days or weeks earlier. The quick sale by the lender of its interest, at what appears to be a loss, would have at first seemed inexplicable, but when considered with the benefit of hindsight, proof of these quick transfers would have been evidence that the lender knew in advance that property values would soon decline. By constantly changing "servicers" on these loans, and by sending out notices of such changes drafted also in intentionally ambiguous verbiage, the bankers behind the scenes cooperated in obscuring the truth as to who had the right to receive the proceeds of the loans, and to foreclose in the event of non-payment. The loans were grouped into "pools" and sold multiple times, thereby increasing profits for the wrongdoers. These "securitized debt pools" were sold on the stock market and elsewhere, and in this manner affected interstate commerce. The real parties in interest also in many instances collected mortgage insurance upon "default."

20. Another part of the scheme was the use of words in ways inconsistent with their traditional meanings, and the creation of new terms which could be used to blur important distinctions between parties and their interests. The ways in which words were utilized all shared one characteristic: they made it more difficult to determine who had the right to receive and utilize for their own purposes the payments made on the loan by the borrower. For example, "mortgagee" began to have a meaning other than "lender." "Servicer" arose to prominence and was and is used to further obscure important truths. Specifically, the "servicer" may or may not hold the true beneficial interest in the mortgage, and the Defendants will NOT release any further information on the subject, whether it is requested in discovery in a foreclosure action or in any other context.

21. With the oversight of Defendant Merscorp and participants in the enterprise, the MERS artifice and enterprise evolved into an "ultra-fictitious" entity, which can also be

understood as a "meta-corporation." To perpetuate the scheme, MERS was and is used in a way so that  the average consumer, or even legal professional, can never determine who or what was or is ultimately receiving the benefits of any mortgage payments. The conspirators set about to confuse everyone as to who owned what. They created a truly effective smokescreen which has left the public and most of the judiciary operating "in the dark" through the present time.

22. On its website, www.mersinc.org,  Defendant Merscorp lists the shareholders of "MERS," which is defined on a separate page of the site as "Mortgage Electronic Registration Systems, Inc." Among the shareholders of MERS, according to the site, are the following institutions: Bank of America, Chase, CitiMortgage, Inc., Fannie Mae, Freddie Mac, HSBC, SunTrust, and Wells Fargo.

23. The conspirators intended to maintain an absolute stranglehold on the American economy for many decades, if not centuries, into the future. This could only be accomplished if the scheme was able to evolve over time in a changing regulatory and consumer environment. The point is that the conspirators adjusted the American lending system and the legal system governing it in a way designed to most effectively gratify their greedy interests over the longest period of time. Through this revolution in the use of words and ephemeral concepts such as the "corporation," the conspirators, including the present Defendants, have by-and-large been successful in changing the paradigm so that the rights of individuals are no longer afforded the safeguards which have been carefully maintained in place since the time of the Magna Carta. As the conspirators and present Defendants have long intended, certain important terms in the mortgages and other legal documents are becoming meaningless. Even the names of the mortgage and lending institutions are interchanged so often that it is difficult to keep track of the constantly shifting parameters of the series of alleged mergers, assertions of subsidiary

relationships, "divisions," and the like with which the American economy and consumer populace are deluged in advertisements and mortgage documents. This is not some random trend which resulted from the mortgage crisis. It is, instead, just another tactic in the vast scheme which ultimately <u>caused</u> it. The end result of the continued obfuscatory actions is that the mortgages and associated documents come to mean whatever their proponents wish them to mean.

24. In the decade after 2000, the participants in the fraudulent mortgage scheme escalated their activity.  They dramatically increased the numbers and amounts of mortgage backed securities and the mortgage loans needed to fuel those securities.  As the scheme escalated, the necessary role of MERS became more prominent.  Late in that decade, the fraudulent mortgage scheme cause great turmoil in the American and world economies, leading to the worst economic crisis since the Great Depression.  This economic crisis, caused by the participants in the fraudulent mortgage scheme caused significant damage to the named plaintiffs and to the class members, including causing many foreclosures such as the one that the named plaintiffs are now facing.

### The Creation and Use of Fraudulent Assignments

25. In the cases of actual or threatened foreclosure, lenders and others seeking to foreclose relied upon MERS to obscure the truth and illegally proceed to foreclosure. Many irregularities appear in the instruments relied upon by the lenders, including some or all of the following:

      a)      The assignor, MERS, had the same address as the assignee (the defendant);

b)       They were executed by a person having the title of "Assistant Secretary;" and

c)       the document would have an "effective date" well prior to the date upon which it was executed, so as to retroactively give standing to the defendant.

26.   In the case of the mortgage executed by Gwendell Lloyd Philpot and wife, Annette Green Philpot, to Mortgage Electronic Registration Systems, Inc. solely as nominee for Homecomings Financial Network, Inc. dated the 4th day of December, 2000, and filed for record in Book 2000, Page 35882, in the Probate Office of Morgan County, Alabama, the first assignment of this mortgage occurred on August 24, 2010, and was recorded in Book 2010, at Page 8671, in the Probate Office of Morgan County, Alabama.  The assignment was made to The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company N.A., as successor to JP Morgan Chase Bank, N.A., successor by merger with Bank One, N.A., as trustee for RASC 2001KS1.  The assignment, on behalf of Mortgage Electronic Registration Systems, Inc. was executed by Colleen McCullough as Assistant Secretary and Vice President of Mortgage Electronic Registration Systems, Inc.  Attached to the assignment, and recorded in Miscellaneous Book 2010, at Page 8672, was a copy of a document entitled "Agreement for Signing Authority", which purported to grant authority from MERSCORP, INC. and its subsidiary, Mortgage Electronic Registration Systems, Inc., GMAC Mortgage LLC ("MEMBER") to Sirote & Permutt, P.C. ("VENDOR") to execute assignments on behalf of Mortgage Electronic Registration Systems, Inc.  This agreement for signing authority had previously been filed in Jefferson County Probate Court, as well as Tuscaloosa County Probate Court, and from all appearances appeared to be a standard form grant of authority for executing mortgage assignments being used by the law firm retained by

MERSCORP, INC. for mortgage foreclosures throughout the State of Alabama.

27.   Also attached thereto was a corporate resolution purporting, through an attached list, to appoint four (4) lawyers at Sirote & Permutt, P.C., including Colleen E. McCullough, as assistant secretaries and vice presidents of Mortgage Electronic Registration Systems, Inc.  These documents were recorded at Miscellaneous Book 2010, Page 8673 and 8675, in the Office of the Judge of Probate, Morgan County, Alabama.

28.   In May of 2009, an attorney who questioned the validity of a similar assignment in Florida deposed the representative of a law firm handling MERS foreclosures in that State.  The witness was asked how she could possibly have acted on behalf of MERS, and as to the meaning of the label "Assistant Secretary:"

> Q: The question was you have no job duties as an assistant secretary of MERS, correct?
> A: I do not have any job duties other than signing the assignments and mortgage. Does that help?
> Q: Yes. Here, I'll try to rephrase this. Do you attend any board meetings at MERS?
> A: No, sir.
> Q: Do you attend any meetings at all at MERS? A: No, sir.
> Q: Do you report to the secretary of MERS? A: No, sir.
> Q: Who is the secretary of MERS? A: I have no idea.

[ ... ]

> Q: Where are the MERS offices located? A: I can't remember.
> Q: How many offices do they have? A: I have no idea.
> Q: Do you know where their headquarters are?
> A: Nope.
> Q: Have you ever been there?
> A: No.
> Q: How many employees do they have?
> A: I have no idea.[1]

29.   The same witness quoted above was, on April 29, 2010, deposed in a separate foreclosure action.  She testified that her signatures on "these assignments," which from all

---

[1] May 20, 2009 deposition of Cheryl Samons, taken in the case styled *Deutsche Bank National Trust Company, as Trustee for Morgan Stanley ABS Capital] Inc. Trust 2006-HE4* v. *Belourdes Pierre, et al.,* Florida's Fifteenth Judicial Circuit case no. 50-2008-CA-028558 XXXX MB, pages 25-26.

indications were and are at least several thousand in number, were in no way attestations that the statements contained therein were accurate or truthful. She further testified that she was the person with the most knowledge about the subject assignment:

> Q: It says, 'but effective as of the 19th day of February, 2008." Do you see that?
> A: Yes.
> Q: Where did you get that date from?
> A: I did not pick that date. That date was put in by the processor that prepared the assignment.
> Q: And who was that?
> A: Off the top-of-my-head, I do not know who actually typed this assignment.
> Q: Okay. But you are signing on behalf of MERS, and you are stating here that it is effective as of the 19th day of February, 2008, correct?
> A: Correct.
> Q: At the time you signed this, what reason did you have, as agent for MERS, to make it effective as of the 19th day of February, 2008?
> A: I did not pick that date. And I do not recall this document.
> Q: Sitting here today, you have no idea why it is that it says, "effective as of the 19th day of February, 2008." Is that correct?
> A: Looking at this one particular piece of paper, I do not recall or know the answer to that question, no.
> Q: Is there some general practice, of which you are aware, that would give us information as to why this particular date was inserted?
> A: That information was determined by the people that review the file prior to me.
> Q: And what would they base that on, as a general practice?
> A: I do not know.
> Q: You don't know? Were, to your knowledge, any physical documents transferred on February 19, 2008?
> A: I do not know.
> Q: To your knowledge, does the 19th day of February, 2008 have any significance?
> A: I do not know.
> Q: Ma'am, if you signed this document on behalf of MERS, picking this date, this effective date-
> A: I did not pick the effective date.
> Q: But you ratified it by signing this; didn't you? [Objection to the form of the question]
> Q: Didn't you attest to the accuracy of that date by signing this document? [Objection to the form of the question]
> A: I would say, no.
> Q: Did you attest to this document, as a whole, by signing it? [Objection to the form of the question].
> A: I do not think that in my capacity of signing these assignments, it was my position to attest. My role was to be given a document that had been reviewed by an attorney, had been reviewed by a title examiner, had instructions from the client, and I was to sign the assignment as secretary on behalf of MERS.

Q: Right. And when you signed it as secretary on behalf of MERS, were you approving and agreeing with the terms contained therein for MERS?

A: I believe I was approving and agreeing to the fact that the mortgage needed to be assigned from MERS to another entity.

Q: But what about all the other details in here, such as the consideration, the effective date? A: I do not believe that that was my role.

Q: Is there anyone, who signed this assignment of mortgage [who] was, at the time they signed, attesting to or approving all of the terms in it, on behalf of MERS?

A: I do not have an answer to that question.

Q: Why don't you have an answer?

A: Because I do not know what you are thinking needs to be attested to, other than the fact that MERS was not the proper plaintiff, and there needed to be an assignment into Citimortgage to foreclose the mortgage.

Q: What I am thinking needs to be approved or ratified is the terms that are written in this document.

A: Okay.

Q: SO did anyone, to your knowledge, approve and agree with all of those terms, on behalf of MERS, in signing this document?

A: I do not have an answer to that question.

Q: If you don't know, then the answer would be "no."

A: Okay. No.[2]

[ .... ]

Q: If you could go back, please, to Exhibit 2, the assignment of mortgage. We are on the first sentence of the first paragraph. You see where it says, "for and in consideration of the sum of one dollar" on the second line of that paragraph?

A: Yes. I do.

Q: Did you pay that dollar, or did you receive that dollar?

A: I did not have anything to do with any money exchanging hands on these assignments.

Q: Okay. So when you signed this assignment, did you take any steps to determine whether or not this one dollar actually changed hands?

A: No.

Q: Do you know of any information that would establish that the one dollar did or did not change hands?

A: No.

Q: Who would I ask to find that out? A: I have no idea.

Q: It says "other good and valuable consideration." Do you see that?

A: I do.

Q: **In** executing this assignment, for and on behalf of MERS, can you tell me what other

---

[2] Deposition of Cheryl Samons, taken April 29, 2010 in the case of *Citimortgage, Inc. v. Dennis Brown, et al.,* Seventeenth Judicial Circuit case no. 08-011097, pp. 37-41.

good and valuable consideration there was that gave rise to this assignment?
A: No, I cannot.
Q: Do you have any idea, in your capacity as assistant secretary of MERS, who I could contact to find out what the good and valuable consideration was?
A: No.
Q: It says "the receipt of which is hereby acknowledged." Do you see that?
A: Yes. I do.
Q: Did you acknowledge receipt of that one dollar and other good and valuable consideration when you signed this document?
A: No.
Q: Can you tell me where, on here, any person signed to acknowledge the receipt of the one dollar and other good and valuable consideration?
A: No.
Q: So when it says, "the receipt of which is hereby acknowledged," is that an error?
A: I have no idea.
Q: Is there anybody who would have more information about this transaction reflected in this assignment, other than you?
A: No.[3]

30. The foreclosures including the one that Defendants are proceeding with against Plaintiffs are each predicate acts in the pattern of racketeering activity herein complained of, and were actions taken in furtherance of the MERS enterprise. The actions could not have been brought without the MERS artifice and the ability to generate any necessary "assignment" which flowed from it.

### The Class

31. The Class consists of all owners of Alabama real property which has been encumbered by a mortgage listing "MERS" as "mortgagee."

32. Joinder of Class Members as individual plaintiffs would be impractical, as their number is in the thousands. The claims of the Class are typical of those brought by the named Plaintiffs.

---

[3] Deposition of Cheryl Samons, taken April 29, 2010 in the case of *Citimortgage, Inc.* v. *Dennis Brown, et al.,* Seventeenth Judicial Circuit case no. 08-011097, pp. 25-27.

33.   There are issues of fact and law common with respect to the claims of the Class and those of the named Plaintiffs.

34.   The named Plaintiffs are adequate class representatives.   There is no conflict between them and the Members of the Class.  Counsel for the Plaintiffs are adequate to represent the Class.

35.   The claims for declaratory and injunctive relief should be certified under Rule 23(b)(2), Federal Rules of Civil Procedure.

36.   The claims for damages should be certified under Rule 23(b)(3), Federal Rules of Civil Procedure.

**Count I - Violation of 18 U.S.C. §1962(c) - Defendant Merscorp, Inc.**

37.   Plaintiffs incorporate paragraphs 1 through 36 herein**.**

38.   **Merscorp, Inc. was created in or about 1998,** and its purpose, from the outset and as it evolved while the fraudulent mortgage scheme was implemented, was to enact the fraudulent scheme/RICO enterprise herein complained of. The corporate resolutions of MERS establish that authorization of employees of foreclosure mills to sign sworn documents about which the employees have no personal knowledge in order to facilitate foreclosures is consistent with its corporate purpose.

39.   Thus, it is not only assignments which Merscorp, Inc., has authorized others to sign without any factual or legal basis; Merscorp, Inc. has granted carte blanche to others to sign and file any and all sworn documents necessary to facilitate illegal foreclosures.

40.   Merscorp, Inc. 's overt acts, in addition to the passing of corporate resolutions similar to Exhibit F, include the following:

a)      Creation of the MERS artifice;

b)      Planning, designing, and enacting the MERS criminal enterprise of which Plaintiffs complain herein;

c)      Arranging for the use of the MERS as "mortgagee" in the standard mortgages at issue;

d)      Drafting of the standard MERS language to be included in such mortgages;

e)      Entering into "agreements for signing authority" which purport to allow employees of law firms to execute assignments in which the "assignor" and "assignee" are strawmen actually not possessed of the capacity stated, and of which the person executing the document has no knowledge;

f)      Creation and maintenance of an acceptable public image for MERS;

g)      Owning and maintaining the registration and licensure of the MERS entity, Mortgage Electronic Registration Systems, Inc, with the necessary state agencies, plus other ministerial acts designed to maintain the corporate shield and to mimic the actions expected of normal corporations so as to fraudulently disguise its true nature.

h)      Facilitating the use of the MERS artifice by other participants in the scheme.

41.  These predicate acts are related. They share a common purpose: defrauding the Class Members and other borrowers of their money and property. They share the common themes of "non-documentation" and concealment of the real parties in interest.

42.  The predicate acts satisfy the RICO continuity requirement: they extend from in or about 1998 through and continue unabated at the present time, which meets the definition of "open-ended" continuity. In the alternative, the participants in the RICO enterprise engaged in a

16

pattern of racketeering activities continuously for a period of time exceeding ten years in duration, which as a matter of law suffices to establish "closed-ended" continuity.

43. As the result of the RICO enterprise of which these actions were part, the Class Members have suffered damages, in that they have lost their homes. The measure of the damages for the Class Members is the average of the accelerated amounts demanded from the Class Members "to Foreclose Mortgage and to Enforce Lost Loan Documents." Since the real parties in interest had already been paid, the mortgages were truly not subject to being foreclosed upon, and the fair market value of the properties for this reason is the measure of the damages suffered by the Class Members.

44. The Class Members are entitled to judgment in the amount of three times their actual damages, which should be arrived at using the formula set forth in said paragraph, plus costs and a reasonable attorneys' fee under 18 U.S.C. §1964(c).

WHEREFORE, the Plaintiff, on behalf of the Class Members, demands judgment against the Defendants, jointly and severally, for the total damages sustained by the Class, plus costs, attorneys' fees, and such additional relief as the Court or jury may deem just and proper, including imposition of liability on the members of the conspiracy not presently named as Defendants in this action.

### Count II - Violation of 18 U.S.C. § 1962(d) - All Defendants

45. Plaintiffs reallege paragraphs 1 through 44 herein.

46. The Defendants have conspired together to violate 18 U.S.C. § 1962(c) by committing fraud and using the U.S. Mail to do so. Because they agreed upon the same criminal objective, to wit: theft of real properties through illegal foreclosures, each is responsible for the actions of the others.

47.   The Defendants provide support for an illegal enterprise and are liable for the actions of those who actively commit the criminal acts. Each of these Defendants has directly or indirectly participated in such enterprise. Merscorp, Inc.'s website makes this clear: "Shareholders played a critical role in the development of MERS. Through their capital support, MERS was able to fund expenses related to development and initial start-up." http://www .mersinc .org/ about/shareholders. aspx.

48.   The Class Members are entitled to judgment in the amount of three times their actual damages, which should be arrived at using the formula set forth in paragraph 32, supra, plus costs and a reasonable attorneys' fee under 18 U.S.C. §1964(c).

## Count III – Failure to Obtain Negotiable Instrument

49.   Plaintiffs reallege paragraphs 1 through 48 herein.

50.   The note that plaintiffs executed and the similar notes that the members of the class executed were "negotiable instruments" under the Uniform Commercial Code.  The assignee did not obtain nor properly acquire the notes through negotiation, and therefore the notes and underlying mortgages are unenforceable.

## Count IV – Unenforceable Mortgage

51.   Plaintiffs reallege paragraphs 1 through 50 herein.

52.   The mortgage that Defendants seek to enforce against Plaintiffs and the similar mortgages that they seek to enforce against the Class members are unenforceable.  The mortgages were delivered to the assignee merely for the purpose of effecting a foreclosure. There has been a divergence in the legal and equitable ownership of a debt and security for repayment.

WHEREFORE, the Plaintiffs, on behalf of the Class Members, demand judgment against the Defendants, jointly and severally, for declaratory and injunctive relief, damages sustained by the Plaintiffs and Class, plus costs, attorneys' fees, and such additional relief as the Court or jury may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated:  March 18, 2011                          Respectfully submitted

                                                s/Joe R. Whatley, Jr.
                                                Joe R. Whatley, Jr.
                                                Whatley, Drake & Kallas
                                                2001 Park Place North, Suite 1000
                                                Birmingham, Alabama 35203
                                                (205) 328-9576
                                                (205) 328-9669 facsimile
                                                Email:  jwhatley@wdklaw.com

                                                Nicholas B. Roth
                                                Eyster, Key, Tubb, Roth,
                                                  Middleton & Adams, LLP
                                                P.O. Box 1607
                                                402 E. Moulton Street
                                                Decatur, AL  35602
                                                Tel: (256) 353-6761
                                                Fax: (256) 353-6767